UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>**MARK ROMRIELL and ROZLYN PRICE ROMRIELL,**<br><br>    Debtors. | Case No. 22-40254-NGH |

**REPORT AND RECOMMENDATION ON UNITED STATES TRUSTEE'S MOTION FOR SANCTIONS AGAINST ATTORNEY AARON J. TOLSON**

**INTRODUCTION**

Before this Court is a Motion for Sanctions against Attorney Aaron J. Tolson filed by the United States Trustee ("UST"). Doc. No. 181. In the motion, the UST requests this Court recommend to the District Court that it initiate disciplinary proceedings against Mr. Tolson. This Court concludes such a recommendation is warranted.

**JURISDICTION**

This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and (b), and 1334(a) and (b). *See also* General Order 349 (referring cases under Title 11 to the bankruptcy court). Cases interpreting bankruptcy court jurisdiction acknowledge this Court's inherent power under § 105(a)[1] to discipline attorneys who appear before it. *See In re Brooks-Hamilton*, 400 B.R. 238, 244 (9th Cir. BAP 2009) (holding that the bankruptcy

---

[1] Unless otherwise indicated, all statutory citations are to the Bankruptcy Code, Title 11 U.S.C. §§ 101-1532, and all citations to "Rule" are to the Federal Rules of Bankruptcy Procedure.

MEMORANDUM OF DECISION - 1

court had jurisdiction to suspend attorney from practice because acts leading to suspension occurred in matter central to administration of bankruptcy case); *In re Brown*, 408 B.R. 509, 512 (Bankr. D. Idaho 2009) (recognizing that a bankruptcy court has inherent power to disbar attorney from practicing before it but following applicable local rules requiring a report and recommendation to the District Court). This is a core proceeding under 28 U.S.C. § 157(b).

**PRELIMINARY MOTION**

In connection with the UST's Motion for Sanctions and Motion to Review Fees, Mr. Tolson filed a Motion to Dismiss the Motion for Sanctions. Doc. No. 186.[2] At the onset of the hearing on the UST's motions, Mr. Tolson argued this Court was not the proper venue to determine such matters, but the presentation of evidence was necessary to make that clear. Accordingly, the Court took the Motion to Dismiss under advisement and proceeded to take evidence.

That Motion to Dismiss will be denied. As Mr. Tolson's conduct occurred during his representation of Debtors in a bankruptcy case, this Court is in the best position to review his actions and to issue an appropriate recommendation. Nothing in the evidence presented suggests it would be improper or impractical for this Court to consider the UST's motion, and the Bankruptcy Code and Rules provide no such prohibition. It is true that under this Court's local rules a report and recommendation must be made to the

---

[2] He also moved, without his client's approval, to mediate the issues raised by the UST, but later withdrew the motion. Doc. Nos. 193, 204.

MEMORANDUM OF DECISION - 2

District Court, but such is done to satisfy its procedures in these matters, not because this is not the appropriate venue.

**STATUTORY POWER TO SANCTION ATTORNEYS**

Bankruptcy courts generally have the power to sanction attorneys pursuant to (1) their civil contempt authority under 11 U.S.C. § 105(a); and (2) their inherent sanction authority. *In re Lehtinen*, 564 F.3d 1052, 1058 (9th Cir. 2009) *abrogated on other grounds by In re Gugliuzza*, 852 F.3d 884, 898 (9th Cir. 2017). In *Chambers v. NASCO, Inc.,* the United States Supreme Court held that the inherent power of a federal court permits it, *inter alia,* "to control admission to its bar and to discipline attorneys who appear before it." 501 U.S. 32, 43 (1991). In *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.),* the Ninth Circuit Court of Appeals held that bankruptcy courts also "have the inherent power to sanction that *Chambers* recognized exists within Article III courts." 77 F.3d 278, 284 (9th Cir. 1996). Finally, if suspension is warranted, it can apply to all bankruptcy courts within the district and is intended as a deterrent rather than a punitive measure.

**PROCEDURE IN THE DISTRICT OF IDAHO**

Pursuant to LBR 9010-1(h), attorney discipline in this Court is governed by the provisions of D. Id. L. Civ. R. 83.5, which provides:

> (1) **General authority of the Court, and conduct subject to discipline.** This Court may impose discipline on any attorney practicing before this Court, whether or not a member of the bar of this Court, who engages in conduct violating the Idaho Rules of Professional Conduct, or who fails to comply with rules or orders of this Court. The discipline may consist of disbarment from practice before this Court, suspension, reprimand, or any other action that the Court deems appropriate and just.

MEMORANDUM OF DECISION - 3

> In the event any attorney engages in conduct which may warrant discipline or other sanctions, the Court may, in addition to initiating proceedings for contempt under Title 18, United States Code, and Federal Rule of Criminal Procedure 42, or imposing other appropriate sanctions pursuant to the Court's inherent powers and/or the Federal Rules of Civil, Bankruptcy or Criminal Procedure, initiate a disciplinary process under section (b)(2) - (4) of this rule, and/or refer the matter under section (b)(8) of this rule.
>
> * * * * *
>
> (4) **Original (non-reciprocal) disciplinary proceedings.**
>    (A) **Initiation of proceedings.** Whenever a district, magistrate or bankruptcy judge of this district believes that conduct of an attorney may warrant disbarment, suspension, reprimand or other discipline by this Court, other than those matters addressed in sections (b)(1), (2) and (3) of this rule, such judge may issue a written report and recommendation for the initiation of disciplinary proceedings (the "recommendation"). The chief district judge, or another district judge if the chief district judge is the judge recommending such action (hereafter the "reviewing judge"), will review the recommendation to determine if reasonable grounds exist for the initiation of disciplinary proceedings. If the reviewing judge determines that disciplinary proceedings should be initiated, the reviewing judge will issue an order to show cause under this rule that identifies the basis for and nature of possible discipline.
>    (B) **Response.** An attorney against whom an order to show cause is issued under this section will have thirty (30) days from the date of the order in which to file a response. The attorney may include in the response (i) a request to submit the matter on the recommendation, affidavits, briefs, and the record, or (ii) for a hearing, whether in-person, telephonic, or by video. The failure to include a request for a hearing will be deemed a waiver of any right to a hearing. The failure to file a timely response may result in the imposition of discipline by the Court without further notice.

D. Id. L. Civ. R. 83.5(b).

**RELEVANT FACTS**

    Mr. Tolson represented Mark and Rozlyn Romriell in a total of three bankruptcy cases. The first was a chapter 7 filed in 2016, *In re Romriell*, 16-40493-JMM, in which

MEMORANDUM OF DECISION - 4

they received a discharge. The second was *In re Romriell*, 19-40443-JMM, a chapter 12 case filed in 2019. In the second case, the Court entered an order requiring Mr. Tolson to refund his fees. This occurred after Mr. Tolson and the UST entered a stipulation resolving the UST's motion to disallow fees based on Mr. Tolson's failure to disclose his compensation and to appear at the meeting of creditors.[3] This case was ultimately dismissed.

Mr. Tolson also represented the Romriells in an insurance matter following a barn fire on their property in the spring of 2021. When the insurance company refused to pay the claim, Mr. Tolson took the case on a contingency basis. Mark Romriell testified that the Romriells signed a contingency fee agreement by which Mr. Tolson would be paid 20% of the recovery or $70,000, whichever was less. Mr. Tolson filed that case in state court but it was removed to federal district court and remains pending. *Romriell v. Berkshire Hathaway, Inc.*, 25-cv-00105-DCN.

Rozlyn Romriell testified that the Romriells spoke to Mr. Tolson about another matter dealing with bank interest overcharges, but they were just preliminary discussions and no representation agreement or discussion of fees ever occurred. Moreover, no case was ever filed. She further testified that they never received a billing statement or invoice from him or his office for any case they conferred about with Mr. Tolson. In other words, the Romriells were not aware of any outstanding invoices owed to Mr. Tolson.

---

[3] *In re Romriell*, 19-40443 at Doc. Nos. 26, 30, and 32.

MEMORANDUM OF DECISION - 5

On June 29, 2022, Mr. Tolson filed the instant case on behalf of the Romriells, this time under chapter 11, subchapter V. Mr. Tolson filed his employment agreement in the case indicating he received a $5,000 retainer and would bill at an hourly rate of $250. Ex. 236. The document further provides that the agreement "shall not apply to . . . any other legal proceedings or services outside the Bankruptcy Court. In the event such proceedings or services are sought, the parties may enter into a new agreement concerning the attorney's fees and costs attendant to such additional proceedings or services." *Id.*

On January 26, 2023, the case was converted to chapter 13. On March 30, 2023, the UST filed a motion seeking a refund of Mr. Tolson's fees pursuant to § 329, Ex. 201, after which Mr. Tolson agreed to limit his fees to $4,000 for representing the Romriells in the chapter 11 and 13 proceedings. Ex. 235 at p. 2 ¶ h.

On June 28, 2023, the Court entered an order confirming the Romriells' chapter 13 plan.[4] Ex. 235. The plan proposed by Debtors and eventually confirmed by the Court provided for plan payments of $8,448 per month, despite Mr. Tolson's original estimate

---

[4] A series of emails in the record clearly evidences pressure exerted by Mr. Tolson on the Romriells to sign off on changes to the chapter 13 plan he proposed. Ex. 203. Despite Rule 2002 requiring at least 21 days' notice to all creditors for a sale initiated by a bankruptcy trustee, he wrote to Rozlyn, "if I don't get a signed order from you tonight, the Trustee said she is just gonna tell the Judge she's converting and selling the house tomorrow . . . . My advice is sign the order so we can move to the next step. I've done what I can Roz, I can't make you sign it, but they will order the house sold tomorrow." When Rozlyn indicated she was hesitant because she knew she would be legally bound if she signed, Mr. Tolson replied, "Yeah there is more to discuss, but you guys better sign this order. The plan can be amended anytime, but without this order you guys will have screwed yourselves royally." He also falsely stated he "took out 4000 of my fees to make it work," when in fact, he agreed to limit his fees only after the UST filed a motion for return of his fees due to an inadequate, ambiguous, and misleading fee disclosure. Ex. 201. The Romriells signed the provided document.

MEMORANDUM OF DECISION - 6

of monthly plan payments in the range of $3,000-$5,000. Doc. No. 110. It soon became apparent that the plan payments and chapter 13 trustee's wage orders were causing significant financial strain on the Romriells and they sought help from family. Mark Romriell's father agreed to refinance their mortgage and the amount due under the chapter 13 plan, and once the creditors were fully paid and the bankruptcy case closed, he would be their only creditor going forward.[5] Mr. Tolson informed the Romriells the amount to pay off their debts was $340,000, Exs. 204-205, and that such amount would need to be paid to "Tolson and Wayment Trust account." Ex. 206.

On November 28, 2023, Mr. Tolson inquired of the chapter 13 trustee what funds were required to pay off the chapter 13 plan. Ex. 211. In response, she gave him two figures: $319,854.08, which was an approximate figure if the Romriells intended the chapter 13 trustee to continue to make the mortgage payments, or $206,000 if the Romriell's intended to manage the mortgage payments on their own. *Id.* Upon forwarding that information to the Romriells, the following email conversation ensued:

> Rozlyn: Can you explain to us what she means? She gave us a number of 340K in September as a payoff.
>
> Tolson: Yes she is trying to say if you want to not pay off the mortgage you could pay less, but I think we just go with the original deal.
>
> Rozlyn: We'd like to pay off the whole mortgage. Which I think was the original deal, correct?
>
> Tolson: Right that is what we are doing. Its [sic] the whole point.

---

[5] The Romriells' property was subject to a deed of trust and not a mortgage. The parties, however, generally referred to the encumbrance as a mortgage, and the Court will do so as well.

MEMORANDUM OF DECISION - 7

*Id.* On November 30, 2023, Mark Romriell obtained a cashier's check in the amount of $340,000 using funds from his father, which was issued to Tolson & Wayment Trust. Ex. 209. The memo line has the words "MKO Farm" inscribed.

The Romriells' intentions were clear, and it is evident that Mr. Tolson understood them. On November 29, 2023, the following text message exchange occurred:

> Rozlyn: How soon before we get the moneys she has of ours released to us?
>
> Mr. Tolson: 30 days or so.
>
> Rozlyn: So the house title will be free and clear and all other debts in the bankruptcy as soon as you receive the $340000
>
> Mr. Tolson: yes
>
> Rozlyn: No leans [sic] or payment. Plus's [sic] we get back most of the money she has kept the last several months.[6]
>
> Mr. Tolson: Right of course we will monitor the [chapter 13] trustee and make sure she's doing it.

Ex. 208.

On December 15, 2023, an Agreed Order Modifying Plan was entered, under which the Romriells would turn over sufficient funds to pay all creditors 100% of their allowed claims, pay pre- and post-petition defaults on their mortgage, make monthly mortgage payments through the month following the month the plan was paid off, and pay the chapter 13 trustee her fees. Ex. 210. The agreed order stated that approximately $206,000 would be needed. Mr. Tolson forwarded funds necessary to complete the

---

[6] During the testimony, it became apparent that the Romriells initially believed Mr. Tolson had given the full $340,000 to the chapter 13 trustee, despite her estimation that only approximately $320,000 would be required to pay off all creditors, including the mortgage lender.

MEMORANDUM OF DECISION - 8

chapter 13 case to the chapter 13 trustee and the Romriells received a discharge in January of 2024. Mr. Tolson did not, however, forward funds to the mortgage lender to pay off the house.

The bank statements from the Tolson & Wayment Trust account show the $340,000 was deposited on December 1, 2023. Ex. 233.[7] At the time of the deposit, the trust account had a balance of $0. The $206,000 payment to the chapter 13 trustee was made on December 8, 2023. *Id.*; Ex. 234. Mr. Tolson made two other withdrawals that same day: $4,500 and $5,000, which he testified were payments to himself for outstanding legal bills for "MKO the farm." Finally, that same day Mr. Tolson transferred $35,000 to himself, and he testified that transfer was to pay himself for "the MKO work that we had done." A few days later, on December 12, 2023, Mr. Tolson made two direct withdrawals to Capital One from the trust account, for $12,300 and $13,795.09 respectively. He testified these funds were used to pay business expenses.[8]

The trust account statement for the following month, January 2024, shows that only $1,934 was deposited during the month for a different client, but ten withdrawals totaling $47,909.01 were made. Mr. Tolson testified that none of the withdrawals were used to pay the Romriell's mortgage. In February 2024, a deposit of $1,487 was made for a different client and funds totaling $17,402.31 were withdrawn from the trust account. Again, Mr. Tolson testified that none of those funds were used to pay the

---

[7] In addition to the trust account bank records, Mr. Tolson testified that his office maintains a Google spreadsheet and a hardcopy of all funds deposited into the trust account. He further testified that the UST requested these documents via subpoena, but he declined to turn them over to the UST.

[8] Mr. Tolson testified that his firm "used Capital One to fund our office."

MEMORANDUM OF DECISION - 9

Romriell's mortgage. By the end of February 2024, the trust account balance was $1,203.83.

Beginning on January 10, 2024, the Romriells sought to verify the mortgage had been paid off and asked for an accounting from Mr. Tolson. Ex. No. 202. They continued to follow up, but Mr. Tolson asserted there were delays, cast blame on the chapter 13 trustee, and made other excuses. Meanwhile, the monthly mortgage payments were not being made and the mortgage fell into default, with the attendant increases in interest and late charges.

In September 2024, the Romriell's lender sent them a notice that their mortgage was delinquent and had a principal balance of $211,757.91. Ex. 220. Mark Romriell texted Mr. Tolson, "What's [sic] deal with this house the bank claims we still owe them $200K? Looked up they still say they own the house?" Exs. 213, 214. In response, Mr. Tolson texted, "They haven't responded to our inquiry yet that I know of. It's common for them to screw up bankruptcy paperwork." *Id.* That same day, Rozlyn texted Mr. Tolson and asked why the bank was asking for payment, to which Mr. Tolson responded, "I have no idea, did they sell the farm?" *Id.* Around September 26, 2024, Rozlyn texted Mr. Tolson, "Ok when I gave you the check you assured me there would be no liens and it would be paid in full." Ex. 215. Mr. Tolson continued to stall and responded, "Yeah that's what I expected to happen as well. So I've been working on that." *Id.* Both Mark and Rozlyn continued to press him for information. *See* Exs. 216, 217, and 221.

In October 2024, eleven months after the Romriells provided the cashier's check to Mr. Tolson, the mortgage holder sent the Romriells a Notice of Trustee's Sale with the

MEMORANDUM OF DECISION - 10

stated intention of selling their home at auction on March 6, 2025. Ex. 222. This prompted further and more insistent inquiries by the Romriells to Mr. Tolson. The Romriells specifically requested copies of documents and communications from Mr. Tolson, including copies of checks drawn on his attorney trust account paying the Romriells' debts. Ex. 221. Mr. Tolson did not provide the requested accounting or any clear answers, but continued to indicate he was working on it and would call them later with updates.

Finally, on December 2, 2024, a little over a year after the Romriells delivered the cashier's check to Mr. Tolson, he finally informed them that he had not used the funds to pay off the mortgage with the following text:

> Just got done. So I've now been through the bank and accountant and can confirm that check never cleared the account, and that my assumption the money was somehow between the [chapter 13] trustee and the mortgage was wrong. Instead it was put on account to litigate with the insurance company. Either way I'll have to pay off the farm mortgage, and then we can settle up on the fees later when we win the insurance case. Let's talk tomorrow I'll try to get the payoff from the bank. Sorry this was such a mess I've never had to deal with this before.

Ex. 218.[9]

In late 2024, the chapter 13 trustee informed the UST that the Romriells had contacted her office and expressed frustration and confusion about her handling of the

---

[9] It is unclear what check Mr. Tolson refers to in the text that never cleared the account. Nothing in the record indicates Mr. Tolson issued any check from his attorney trust account to the mortgage company. The check drawn on the trust account to the chapter 13 trustee was honored and the funds were deducted from the trust account.

MEMORANDUM OF DECISION - 11

$340,000. She explained to them that she had only received $206,000 from Mr. Tolson to pay off the chapter 13 case. This ultimately led to the motion before the Court.

In response to a subpoena from the UST, Mr. Tolson provided many pages of invoices for work done for "MKO, LLC" beginning on July 31, 2016 and extending through February 28, 2024. Ex. 232. Based on the testimony, the Court concludes there are several problems with this "accounting." First, the record contains no representation agreement between Mr. Tolson and MKO, LLC, and Mr. Tolson testified that he had no such written agreement. Moreover, MKO, LLC has been dissolved with the Secretary of State. Additionally, even assuming MKO, LLC has any interest in the insurance action, any fees for Mr. Tolson's work in that action are not yet earned, as the fee is based on a contingency agreement and the case has not yet concluded. Further, the Romriells, and not MKO, LLC, are the plaintiffs in the insurance case. Therefore, it is unclear how Mr. Tolson could charge MKO, LLC for work related to the insurance case.

Second, according to Mr. Tolson's testimony, the documents in Exhibit 232 were created after the UST sought billing records from Mr. Tolson via subpoena. In other words, the invoices do not reflect contemporaneous time records and were instead prepared years after the fact. Mr. Tolson testified he used Quickbooks to create them from existing information, and the evidence at the hearing shows Mr. Tolson never sent the Romriells an invoice for any work.

Finally, there are numerous problems with the invoices themselves. Many of the time entries are vague and difficult to understand. For example, included in the invoices is a 9.3 hour entry on August 30, 2021, totaling $2,325, described as "[d]oing more

MEMORANDUM OF DECISION - 12

submission." Ex. 103. And a June 27, 2017, entry for ten hours totaling $2,500 for "[d]oing brief on related bankruptcy issues." *Id*. Further, not all dates on the invoices are consistent. For example, Invoice 18319, dated March 31, 2017 includes a time entry dated "04/28/2025" and a mailing fee dated "08/28/2025." *Id*. The rates charged on the invoices are also inconsistent. For example, invoice 18315, dated December 31, 2016 includes a rate of $200 per hour. The next invoice, number 18316, dated January 31, 2017, includes a rate of $250 per hour. And the next invoice, number 18317, dated February 28, 2017, includes a rate of $200 per hour. *Id*. Finally, Mr. Tolson testified that he charged the Romriells to attend a conference in Washington D.C. on October 28, 2019, as well as another conference on October 17, 2022, both of which are reflected in Ex. 232 and neither of which were authorized by the Romriells.

**ANALYSIS**

Regrettably, the analysis of Mr. Tolson's conduct in light of the Idaho Rules of Professional Conduct[10] is abundantly clear. Mr. Tolson violated multiple Ethical Rules and discipline in the nature of disbarment is warranted.

**1. Mr. Tolson violated Ethical Rules 1.2 and 1.4.**

The Court starts its analysis with a lawyer's duty to abide by a client's decisions and duty to communicate with a client. Ethical Rule 1.2(a) provides in relevant part that "a lawyer shall abide by a client's decisions concerning the objectives of representation

---

[10] The Idaho Rules of Professional Conduct apply to attorneys practicing before the Bankruptcy Court. L.B.R. 9010(g); D. Id. L. Civ. R. 83.5(a). All references to "Ethical Rule" will be to the Idaho Rules of Professional Conduct.

and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued." Here, the Romriells made clear to Mr. Tolson how he was to disburse the $340,000 deposited into his trust account. The Romriells instructed Mr. Tolson to pay the amount due under the chapter 13 plan so they could exit the bankruptcy and pay the mortgage encumbering their house. *See.* Ex. 208. The Romriells testified their goal was to exit the bankruptcy owing only Mark Romriell's father the $340,000 they borrowed to refinance their debts. Mr. Tolson violated Ethical Rule 1.2(a) when he failed to abide by the Romriells' instructions regarding these funds.

In his closing argument, Mr. Tolson argued that the Romriells changed their minds regarding how the $340,000 would be used. He claimed the Romriells asked him to try to "negotiate the mortgage to something lower." Doc. No. 213 at p. 3. Instead of using the funds in the trust account to pay the mortgage, he asserts the Romriells agreed those funds could be used to pay amounts due to his firm for MKO, LLC. *Id*. Mr. Tolson's explanation, however, is problematic.

Mr. Tolson would have been required to obtain the Romriells' informed consent to use their funds to pay outstanding invoices owed by MKO, LLC.[11] The term "informed consent" is defined in Ethical Rule 1.0(e) as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the

---

[11] Mr. Tolson would also have been required to obtain the informed consent of MKO, LLC to use the Romriells' personal funds to pay MKO, LLC's outstanding legal bills. *See* Ethical Rule 1.8(f) (which provides that a lawyer shall not accept compensation for representing a client from one other than the client unless, among other things, the client gives informed consent).

MEMORANDUM OF DECISION - 14

proposed course of conduct." Comment 7 to that rule states, "[o]btaining informed consent will usually require an affirmative response by the client or other person. In general, a lawyer may not assume consent from a client's or other person's silence." At best, Mr. Tolson assumed he had the Romriells' consent to use their funds to pay the MKO, LLC invoices. The applicable ethical rules, however, did not permit Mr. Tolson to make such an assumption. There is nothing in the record that demonstrates the Romriells affirmatively represented to Mr. Tolson he could use the funds in his trust account to satisfy legal bills owed to his firm by MKO, LLC. On the contrary, as discussed above, the email and text communications admitted into the record demonstrate the Romriells expected Mr. Tolson to use the $340,000 deposited into his trust account to pay the chapter 13 trustee and their mortgage.

Next, Mr. Tolson violated Ethical Rule 1.4(a)(3) which requires a lawyer to "keep the client reasonably informed about the status of the matter." Despite repeated requests for information, Mr. Tolson not only failed to keep the Romriells reasonably informed about the status of payment to their mortgage holder, but lied to them, deflected, and continually made excuses and put them off until "tomorrow." The record reflects that the Romriells sought information from Mr. Tolson regarding the status of their mortgage starting in at least January 2024. Their efforts became more urgent when they received notifications from their mortgage company that the mortgage was delinquent, Ex. 220, and the foreclosure sale notice, Ex. 222. Even though Mr. Tolson had paid himself with the funds the Romriells thought had been used to pay the mortgage, Mr. Tolson did not disclose this information to the Romriells until approximately two months after they

MEMORANDUM OF DECISION - 15

received the foreclosure sale notice. *See* Ex. 218, 220. Mr. Tolson did not disclose his use of the funds to the Romriells until December 2024, approximately one year after he started paying himself with the funds.

Finally, the Court concludes Mr. Tolson violated Ethical Rule 1.4(a)(4) when he failed to "promptly comply with [the Romriells'] reasonable requests for information; including a request for an accounting as required by Rule 1.5(f)." The Romriells requested Mr. Tolson provide them with an accounting of how the trust account funds were used. Ex. 221. Mr. Tolson did not promptly provide such an accounting. Instead, the Romriells did not learn how their funds were disbursed from Mr. Tolson's trust account until after the UST obtained the trust account bank statements.

### 2. Mr. Tolson violated Ethical Rule 1.15.

Attorney trust accounts are highly regulated by the Idaho State Bar. Ethical Rule 1.15 requires attorneys to keep client funds separate from their own, hold them in a client trust, and provide a prompt accounting to the client. Wrongfully keeping a client's property, even without a finding of dishonesty, fraud, deceit, or misrepresentation, violates Ethical Rule 1.15. *See Idaho State Bar v. Pangburn (In re Pangburn)*, 296 P.3d 1080, 1085 (Idaho 2013) (disbarring attorney who converted client funds that were part of disputed attorney's fees).

Mr. Tolson violated Ethical Rule 1.15(a) because he did not hold the Romriells' funds "with the care required of a professional fiduciary" in a trust account. *Id.* at Comment 1. Instead, he converted the funds to his own or his firm's use. Under Idaho law, conversion is "any distinct act of dominion wrongfully exerted over another's

personal property in denial or inconsistent with his rights therein, such as a tortious taking of another's chattels, or any wrongful exercise . . . over another's goods, depriving him of the possession, permanently or for an indefinite time" and does not require dishonesty. *Pangburn*, 296 P.3d at 1085 (quoting *Klam v. Koppel*, 118 P.2d 729, 732–33 (1941)). A finding of bad faith is not required. Here, rather than hold the funds in trust and pay the mortgage off as he was instructed to do, Mr. Tolson used the Romriells' funds as his own, paying office expenses and attorney fees that may not have yet been earned and had definitely not been invoiced to his clients. This conversion of funds violates Ethical Rule 1.15(c) which requires attorneys to keep advance payments for legal fees and expenses in a trust account until earned.

### 3. Mr. Tolson violated Ethical Rule 8.4.

Turning to Ethical Rule 8.4(c), which provides that a lawyer "shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation," the Court concludes Mr. Tolson violated this rule. He repeatedly gave the Romriells false explanations about why the mortgage lender did not acknowledge the mortgage had been paid off, blaming slow paperwork by the mortgage company and the alleged dishonesty of the chapter 13 trustee. The Romriells suffered harm from these actions, incurring additional interest and late charges and finally facing a non-judicial foreclosure. He has never fully repaid the Romriells the money they entrusted to him, though he remitted sufficient funds to the mortgage company to cure the arrearage and stop the foreclosure.

**REMEDY**

Though not explicitly required, *see Brooks-Hamilton,* 400 B.R. at 255 (Markell, J., concurring), and *In re Nguyen*, 447 B.R. 268, 277 (9th Cir. BAP 2011), consideration of the American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards") is beneficial to the Court's analysis.[12] Those standards are (1) whether the duty violated was to a client, the public, the legal system, or the profession, (2) whether the attorney acted intentionally, knowingly or negligently, (3) the seriousness of the actual or potential injury caused by the attorney's misconduct, and (4) the existence of aggravating and mitigating factors. A finding of bad faith is not required.

The Court concludes Mr. Tolson's actions in this case are violative of these benchmarks. His personal use of the Romriells' funds violated his duty to his clients and reflects poorly on both the legal system and the legal profession. Moreover, Mr. Tolson acted intentionally and knowingly, as the evidence is clear he understood the purpose of the funds he received over the amount necessary to pay the chapter 13 plan and deliberately chose to spend them on something else. The injury to the Romriells is serious, as their home went into default, they faced foreclosure, and late charges and interest accrued. Indeed, they have yet to be made whole.

Finally, Mr. Tolson has offered no mitigating factors. While he demonstrated that he has done work for many years for the Romriells and they have not paid him very much, the Court finds this is not a mitigating factor. The fact that he apparently routinely

---

[12] The ABA Standards, formally cited as Joint Committee on Professional Sanctions, Standards for Imposing Lawyer Sanctions, are available at http://www.abanet.org/cpr/regulation/scpd.

did legal work for the Romriells without a representation agreement and without invoicing them for his services indicates only a lack of diligence on his part.

The Idaho Supreme Court observed, "[t]he ABA Standards for Imposing Lawyer Sanctions advise that disbarment is an appropriate sanction when an attorney converts a client's money." *Pangburn,* 296 P.3d at 1085.  The Court concludes that not only did Mr. Tolson violate the Ethical Rules, but he converted the Romriells' property he held in trust in violation of the Ethical Rules and ABA Standards.

**RECOMMENDATION TO THE DISTRICT COURT**

Pursuant to D. Id. L. Civ. R. 83.5(b)(4)(A), the Bankruptcy Court recommends the District Court initiate disciplinary proceedings against attorney Aaron J. Tolson.  Due to the severity of the violations of the Idaho Rules of Professional Conduct, this Court recommends that Mr. Tolson's license to practice law in the United States Courts for the District of Idaho be revoked.

The Clerk will transmit this proposed disposition to the District Court for its review and decision.

DATED:  September 29, 2025

_____
NOAH G. HILLEN
Chief U.S. Bankruptcy Judge